# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| VAL ASHLEY,<br><br>               Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>               Defendant. | **MEMORANDUM DECISION and ORDER**<br><br>Case No. 2:09-cv-00295-DN<br><br>Judge David Nuffer |

      Plaintiff Val Ashley seeks judicial review of the decision of the Commissioner denying his applications for Disability Insurance Benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act.[1] The case is before the magistrate judge by consent of the parties under 28 U.S.C. § 636(c).[2] After a careful review of the entire record and the parties' submissions, the magistrate judge concludes that the decision of the Commissioner should be affirmed.

## Background

### Medical History

      Mr. Ashley suffered his first heart attack in October 2005,[3] and alleges that he has been disabled since October 2006, after his second heart attack at age 42.[4] During his first heart

---

[1] 42 U.S.C. §§ 401-433, 1381-1383f.

[2] Docket no. 9, filed September 15, 2009.

[3] R. 220-89.

[4] R. 133-45.

surgery, stents were placed in his clogged left anterior descending coronary artery.[5] Ashley was discharged from the hospital two days after admission, with diagnoses of coronary artery disease, diabetes, and cardiomyopathy.[6] He was discharged with several prescriptions, including metformin, Avandia, and Amaryl (which are all diabetes drugs); Crestor and Plavix (cholesterol drugs); aspirin; and enalapril (a chronic heart failure medication).[7] Within the next few days during a follow-up visit with Michelle Frost, Nurse Practitioner (NP), Ashley reported felling well, with no complications from the surgery.[8]

In February 2006, Ashley saw Cynthia Campbell, Family Nurse Practitioner (FNP), to refill a prescription for diabetes medicine, stating he had been diagnosed with diabetes about six years earlier.[9] Ashley reported some decreased sensation and burning in his feet.[10] Nurse Campbell assessed that he had adult onset diabetes mellitus, cardiovascular disease, and hyperlipidemia, and prescribed refills of Crestor (a cholesterol medication) and diabetes medications.[11]

Ashley suffered a second heart attack on October 2006.[12] Upon admission to Heber

---

[5]R. 232-38.

[6]R. 213.

[7]R. 235.

[8]R. 215-16.

[9]R. 211.

[10]*Id.*

[11]*Id.*

[12]R. 256-59.

Valley Medical Center, he reported that until that time, he had not had any heart problems since his first heart attack, and was not on cardiac medication.[13] Ashley was transferred to Utah Valley Regional Medical Center, where over the next three days, Marvin Allen, M.D., a cardiologist, ordered cardiovascular tests and performed several procedures, including left heart catheterization and coronary angioplasty, involving placement of five stents in Ashley's right coronary artery.[14] Ashley was discharged with diagnoses of coronary artery disease, diabetes, hypertension, hyperlipidemia, and cardiomyopathy.[15]

Two weeks later, on November 3, 2006, Ashley was admitted to Utah Valley Regional Medical Center for treatment of chest pain.[16] At that time, Ashley reported he was not taking his cardiac medication, primarily because of financial constraints.[17] Dr. Allen ordered several cardiovascular tests.[18] During a treadmill test, Plaintiff developed either a leg cramp or dyspnea (shortness of breath) and the test was converted to an adenosine thallium scan.[19] The tests indicated a low probability of stress-induced ischemia (interference with the normal flow of blood to the heart), but severe left ventricular enlargement, and severe decreased left ventricle

---

[13]R. 257.

[14]R. 259, 268-69, 282-83, 286-87 290-95.

[15]R. 268-69.

[16]R. 212.

[17]*Id.*

[18]R. 272-73.

[19]R. 212, 265, 272-73.

function.[20]  At discharge two days after admission, the diagnoses were coronary artery disease, ischemic cardiomyopathy with an ejection fraction of 30-35%, diabetes, and hypotension.[21]  Dr. Allen determined that additional stents were unnecessary and also postponed any discussion of an implanted cardiac defibrillator.[22]  Ashley was given sample medication, educated on the consequences of not complying with the medication regimen, and discharged with instructions to follow-up at the clinic in the upcoming weeks.[23]

On November 15, 2006, Ashley underwent an echocardiogram test that showed some improved findings: mild left ventricular enlargement and left ventricular ejection fraction of 35%; moderate diastolic dysfunction; severe left ventricle systolic dysfunction; and left ventricular internal end diastolic diameter ("LVIDd") of 6.07 cm.[24]

Later in November 2006, Ashley saw Scott Lange, P.A., of the Central Utah Clinic, for a follow-up examination.[25]  Ashley reported that he had slight chest pain with exertion and rest.[26]  The cardiovascular examination was normal, including no signs of edema and the diagnoses remained mostly the same.[27]

---

[20] R. 212, 265, 272.

[21] R. 212, 266, 311.

[22] R. 266.

[23] Id.

[24] R. 306- 07.

[25] R. 304-05.

[26] R. 304.

[27] R. 304-05.

A month later, in late December 2006, Ashley was seen again by P.A. Lange for a follow-up.[28] He reported that he was "doing well," walked an hour each day, and did not have any chest pain (angina).[29] He also reported that he was not taking his medication, primarily for financial reasons.[30] The examination confirmed that his heart condition remained stable.[31]

In late January 2007, Ashley visited Heber Valley Medical Center, complaining of headaches, nausea and blurred vision.[32] The attending doctor diagnosed and treated Ashley for a migraine headache, and recommended that he follow up with his primary doctor.[33]

In early February 2007, Ashley saw Nurse Campbell, complaining of headaches, congestion, and foot pain.[34] He said his job as a cashier required him to stand for long hours and that, at the end of the day, his feet hurt.[35] Nurse Campbell diagnosed Plaintiff with plantar fasciatus[36] and prescribed anti-inflammatory medication along with the recommendation that Ashley rest and elevate his feet twice a day while at work.[37] She noted that she would refer him

---

[28]R. 302-03.

[29]R. 302.

[30]R. 303.

[31]R. 302.

[32]R. 202.

[33]*Id.*

[34]R. 208.

[35]*Id.*

[36]Plantar fasciatus is irritation and swelling of the thick tissue on the bottom of the foot.

[37]R. 208.

to a podiatrist if the symptoms persisted.[38] Ashley returned to see Nurse Campbell later that month complaining of worsening foot pain, but the examination did not reveal any swelling or inflammation.[39] Nurse Campbell also refilled his diabetes medication, but noted that Ashley's diabetes was poorly controlled and he had not been compliant with his medication.[40]

On June 26, 2007, Ashley sought care at the Heber Valley Medical Center to deal with thoughts of suicide.[41] He reported that he was recently served divorce papers and was living out of his car on the street.[42] He reported that he had not been taking his medications because he did not have the money for them.[43] After an examination by the attending physician, Ashley was discharged to the care of a friend.[44]

In September 2007, Ashley sought medication refills from Nurse Campbell.[45] Nurse Campbell noted that his diabetes was controlled and Plaintiff reported "doing well."[46] From mid-September through November 2007, Ashley sought treatment in connection with a car accident

---

[38] *Id.*

[39] R. 206.

[40] *Id.*

[41] R. 251.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] R. 205.

[46] *Id.*

and two other incidents which resulted in neck strain and wrist and ankle sprains.[47] A spinal x-ray showed no fractures or focal malalignment.[48] Similarly, a computed tomography (CT) brain scan was also normal, aside from some inflammation of the sinuses (sinusitis).[49] During a September 2007 examination in connection with a fall, the attending doctor found that Ashley had sprained his ankle and strained his neck, had resulting gross instability, but no significant swelling, and his remaining findings were normal.[50] Ashley reported no numbness or tingling in his arms or legs, chest pain, headaches, or change of vision.[51]

In December 2007, David Peterson, M.D., a State agency physician, reviewed the medical record and assessed Ashley's physical residual functional capacity, finding that he was capable of a full range of light work.[52]

On January 11, 2008, Ashley underwent a consultative psychological evaluation by Dr. Laurie Edwards, Ph.D.[53] Ashley reported a longstanding history of depression dating back to high school, including two suicide attempts in the few years since his heart attack.[54] Ashley reported that since his heart attacks, he has felt "extremely fatigued, is easily winded and

---

[47]R. 196-98, 203-04, 301.

[48]R. 198.

[49]R. 301.

[50]R. 197.

[51]R. 196.

[52]R. 343-50, 370; *see also* 20 C.F.R. § 404.1567(b).

[53]R. 321.

[54]*Id.*

frequently has chest pain."[55] He reported symptoms described as a "burning pain" from his knees to his feet, and that he suffered from migraine headaches up to three days per week.[56] Ashley told Dr. Edwards that his daily activities included spending most of his days watching television, along with grocery shopping for his grandmother and visiting a friend roughly once per week.[57] Dr. Edwards found Ashley's thought processes and content to be within normal limits, and found his judgment intact and his insight to be fair, and opined that Ashley could benefit from ongoing psychotherapy and medication management through Valley Mental Health.[58]

In May 2008, Dennis Taggart, M.D., a State agency physician, reviewed the medical record as part of the disability reconsideration process.[59] Dr. Taggart concurred with Dr. Peterson's previous residual functional capacity assessment which limited Ashley to a full range of light work.[60]

In July 2008, following her examination of Mr. Ashley, FNP Campbell completed a check-box medical statement confirming that Ashley suffers from diabetes with peripheral neuropathy.[61] Nurse Campbell rated Ashley as retaining the ability to: work up to 4 hours per day; stand 30 minutes at a time, two hours total in a workday; sit 15 minutes at a time, two hours

---

[55]R. 322.

[56]*Id.*

[57]*Id.*

[58]R. 322-24.

[59]R. 359.

[60]*Id.*

[61]R. 364.

total in a workday; lift 10 pounds frequently, and balance frequently.[62]

A few days later, Ashley visited Rachelle Frost, APRN, complaining of having chest pains unrelated to activity, increased shortness of breath and occasional palpitations.[63] Ashley reported he was experiencing headaches approximately every other day and had swelling and numbness in his feet as well as leg pains.[64] Nurse Frost noted that she had not treated Plaintiff for over a year, but completed a check-box medical statement regarding Ashley in which she confirmed that he has fatigue upon exertion, palpitations, and anginal pain/discomfort.[65] She stated that Ashley has decreased left ventricular ejection fraction of 30-35%.[66] She rated Mr. Ashley as being able to: work up to 4 hours per day; stand up to 15 minutes at one time, 60 minutes total in one workday; sit up to 60 minutes at a time, 4 hours total in a workday; lift five pounds occasionally andnever engage in frequent lifting; and needed to elevate his legs occasionally during the workday.[67]

### Ashley's Hearing Testimony

In the Function Report that Ashley completed as part of the disability application process, he described his daily activities, including attending to his personal needs, preparing meals, doing laundry and dishes, driving, caring for his dogs, taking hour-long walks, going to the store, and

---

[62] R. 364.

[63] R. 368.

[64] Id.

[65] R. 366.

[66] Id.

[67] R. 366-67.

caring for his grandmother and her needs.[68]

At the hearing before the Administrative Law Judge (ALJ), Ashley was represented by counsel.[69] Ashley testified that he was unable to work an eight hour day because of poor endurance, low energy, a tendency to become nauseated, and pain in his legs and feet from standing.[70] He stated that due to pain, he sometimes stayed in bed all day.[71] He explained how suffered from depression.[72] He also testified about his heart condition which was treated with seven stents that improved his functional performance.[73] Ashley stated that he controlled his diabetes with medication, but that he could not always afford the medication.[74] He reported that due to diabetes: he had lost his teeth; had a tendency to become nauseated; had to use the bathroom frequently; had developed rashes on his legs; and had swelling and pain in his legs and feet.[75] He also claimed that his ankle hurt, and stated that staying off his feet and elevating them relieved the pain.[76] He testified that he elevated his feet for one-and-a-half hours to five hours

---

[68] R. 180-84.

[69] R. 24.

[70] R. 26-27, 31, 35, 48-49.

[71] R. 31.

[72] R. 36-38, 41, 45-47.

[73] R. 27-28, 41.

[74] R. 31-32, 39.

[75] R. 32-33, 35-36, 40-42, 49.

[76] R. 33-35.

daily.[77]

Ashley testified that on a given day he could walk one to one-and-a-half miles, stand two to three hours at a time, and sit as long as needed.[78] He said that going up stairs required a lot of energy, but he was capable of navigating them without handrails.[79] He stated that he was capable of self-care, and performed his chores in the morning so he could rest his legs in the afternoon.[80]

## Vocational Expert's Hearing Testimony

Vocational expert (VE) James Grissom testified that Ashley could not return to his former employment as a cashier, garbage collector, or insulation installer because they require too much exertion.[81] Based upon the ALJ's hypothetical pertaining to Ashley, that included performing only a limited range of sedentary, unskilled work, at a low stress level, and a lower production level, only occasionally with the general public, and requiring only low memory, lower concentration, and no foot control work, the VE testified that a person with such limitations could perform the sedentary, unskilled jobs of addresser, dowel inspector, and final assembler.[82] In response to further questioning, the VE testified that if such an individual also needed to elevate his feet at will for up to an hour-and-a-half per day, it would eliminate all

---

[77] R. 53-54.

[78] R. 28.

[79] R. 45.

[80] R. 42, 54.

[81] R. 55-56.

[82] R. 57-58.

jobs.[83]

## ALJ's Decision

The ALJ evaluated Ashley's claim under the five-step sequential evaluation process.[84] At step one, the ALJ found that Ashley had not engaged in any substantial gainful activity since October 5, 2006, his alleged onset date for his disability.[85] At steps two and three, the ALJ found that Plaintiff had severe impairments, but his conditions did not meet or equal the requirements of any of the listings.[86] During step four, the ALJ found that Ashley retained the residual functional capacity (RFC) to perform unskilled sedentary work[87] with the following additional limitations:

>  no climbing flights of stairs (a few steps permitted);
> 
> needed quick access to a restroom;
> 
> needed work with a low level of stress, including a low production rate and only occasional contact with the general public;
> 
> required a low level of concentration, defined as the ability to be alert and attentive and perform unskilled work;
> 
> required a low memory level; and
> 
> should not require use of foot controls.[88]

---

[83] R. 60-61.

[84] See 20 C.F.R. § 404.1526.

[85] R. 11.

[86] R. 11-16.

[87] See 20 C.F.R. § 404.1567(a).

[88] R. 16-19.

At the final step, the ALJ found that Plaintiff could not perform any of his past jobs, but based on vocational expert testimony, he was not disabled because he could perform a significant number of unskilled sedentary jobs that exist in the national economy, including addresser, dowel inspector, and final assembler jobs.[89]

**Issues**

In this court, Ashley claims the ALJ erred:

    when he failed to find that diabetes was a severe impairment at step two;

    in failing to properly evaluate Ashley's conditions under Listing 4.02, and the ALJ's evaluation under Listing 4.02 is insufficient as a matter of law;

    in failing to evaluate Ashley's heart disease under Listing 4.04; and

    when he failed to include Ashley's need to elevate his legs in the RFC assessment.

**Analysis**

On review, this court "determine[s] whether the ALJ's decision is free from legal error and supported by substantial evidence."[90] However, the court cannot "reweigh the evidence or substitute [its] judgment for the Commissioner's."[91]

<u>Step Two Error</u>

Ashley argues that the ALJ erred when he did not find Ashley's long-standing diabetes to be one of his severe impairments at step two. In step two, the ALJ ruled that Ashley has the severe impairments of coronary artery disease, major depressive disorder, and personality

---

[89]R. 19-20.

[90]*Wall v. Astrue,* 561 F.3d 1048, 1052 (10th Cir. 2009).

[91]*Cowan v. Astrue,* 552 F.3d 1182, 1185 (10th Cir. 2008).

disorder.⁹² Although Ashley's medical records and testimony all mention that he suffers from diabetes, the ALJ did not include diabetes as an impairment severe enough to limit Ashley's ability to do basic work activities. But the ALJ did not deny Ashley's claim at step two of the sequential evaluation process, and proceeded through to step five of the process. The Tenth Circuit has held that any error at step-two became harmless when the ALJ determined that Ashley "could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."⁹³

### Listing 4.02

Ashley asserts that the ALJ erred in his conclusion and lack of analysis when he determined that Ashley did not meet the requirements of listing 4.02, Chronic heart failure.⁹⁴ The ALJ considered Ashley's heart impairment and expressly found that it did not meet or equal the requirements of listing 4.02. As part of his analysis, the ALJ outlined the requirements of the listing, including the requisite medical documentation concerning the claimant's heart function.⁹⁵ Finally, the ALJ concluded that, although Ashley had a history of chronic heart failure, there was no evidence that the required elements in the listing had been satisfied.⁹⁶ Ashley argues that he did indeed meet at least some of the required elements.⁹⁷

---

⁹²R. 11.

⁹³*Carpenter v. Astrue,* 537 F.3d 1264, 1266 (10th Cir. 2008).

⁹⁴20 C.F.R pt. 404, subpt. P., app. 1.

⁹⁵R. 12-13.

⁹⁶R. 13.

⁹⁷Opening Brief at 19-20, docket 14, filed Dec. 20, 2009.

At step three, it is Ashley's burden to show that he satisfies *all* of the criteria in the listed impairment.[98] When discussing the requirements of listing 4.02 in the decision, the ALJ specifically cited medical reports documenting that the levels of Ashley's heart function did not meet the *all* of the required criteria in the listing.[99] Although the ALJ could have done a more detailed comparative analysis between the listing and Ashley's medical reports, there is sufficient analysis to conclude that Ashley did not meet all of the required criteria in the listing, especially when read with the findings at other steps of the sequential process.[100]

Yet, Ashley continues to argue that the ALJ erred in not finding him disabled under the listing because "there is an abundance of medical evidence that satisfies nearly all of the elements of Listing 4.02."[101] Unfortunately, satisfying "nearly all" of the elements in the listing is not the standard that Ashley must meet. Instead, Ashley has the burden to show that he satisfies *all* of the criteria in the listing. This he simply cannot do from the record evidence in this case.

Ashley also argues the ALJ should have ordered an exercise tolerance test to determine if he met the requirements of subsection 4.02B(3).[102] None of Ashley's medical providers had ever

---

[98] *See Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007) ("At step three, if a claimant can show that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits."); *see also* 20 C.F.R. § 404.1525 (c)(3) and (d) (a medically determinable impairment meets a listed impairment when it satisfies all of the criteria of that listing); 20 C.F.R. § 404.1526 (explaining medical equivalence).

[99] R. 13, 282-83, 306-07.

[100] *See Fischer-Ross v. Barnhart*, 431 F.3d 729,733 (10th Cir. 2005) ("[A]n ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment.").

[101] Reply Brief at 2, docket no. 18, filed Feb. 26, 2010.

[102] *See* 20 C.F.R. pt. 404, subpt. P, app. 1, listing 4.02B(3) (The requirements of Listing 4.02B(3) are met if there is evidence that Plaintiff is unable to perform an exercise tolerance test at a workload equivalent to 5 METS (metabolic equivalents) or less due to specific conditions described in the regulations.).

required him to perform this specific test. And although it is the claimant's burden at step three to provide the evidence of a disability,[103] neither Ashley nor his counsel requested the exercise tolerance test during the hearing. Because the ALJ could determine that Ashley did not meet all of the criteria of listing 4.02 based on the record evidence, and neither Ashley nor his counsel requested the tolerance test, the ALJ was not obligated to obtain the tolerance test for his decision.[104]

### Listing 4.04

Ashley asserts that the ALJ erred when he did not specifically address listing 4.04, Ischemic heart disease,[105] and obtain an exercise tolerance test to determine whether Ashley's heart impairment met the requirements of subsection 4.04A.[106] As previously discussed, neither Ashley nor his counsel requested the exercise tolerance test or suggested that Ashley's condition met the requirements of the listing. While it is not claimant's burden to specifically identify the relevant listings of his condition,[107] it is Ashley's step three burden to present evidence establishing his impairments meet or equal all the listed impairments,[108] which he fails to do.

---

[103] *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

[104] *See Cowan v. Astrue*, 552 F.3d 1182, 1187-88 (10th Cir. 2008) (no need to further develop the record when sufficient information exists for the ALJ to make a disability determination and claimant's counsel does not request that additional records be obtained).

[105] 20 C.F.R pt. 404, subpt. P., app. 1.

[106] *See* 20 C.F.R. pt. 404, subpt. P, app. 1, listing 4.04A (The requirements of Listing 4.04A are met if there is evidence of a sign or symptom-limited exercise tolerance test that demonstrates at least one of four identified manifestations at a workload equivalent to 5 METS (metabolic equivalents)).

[107] *See Fischer-Ross*, 431 F.3d at 733 n.3.

[108] *See id.; Lax,* 489 F.3d at 1084.

There is some evidence that Ashley received a diagnosis of symptoms "consistent with ischemic cardiomyopathy,"[109] but the record evidence does not establish that he had the required symptoms or varying types of chest discomfort as described in subsection 4.00E, Evaluating Ischemic Heart Disease.[110] Furthermore, in November 2006, shortly after his second heart attack, Ashley performed a treadmill test which diagnosed him with a low probability of stress-induced ischemia.[111] Once again, the ALJ could determine that Ashley did not meet all of the criteria of listing 4.04A based on the record evidence, and therefore was not obligated to obtain an exercise tolerance test that neither Ashley nor his counsel requested.[112]

### Need to Elevate Legs

Ashley's final argument is that the ALJ erred in failing to include the need to elevate his legs throughout the day in the hypothetical to the VE, and in failing to explain why he did not include that functional limitation in his RFC assessment.[113] Ashley asserts that the "evidence clearly establishes that Mr. Ashley needs to elevate his legs as needed throughout the day" and he cites to specific pages in the record at 208, 367, 35, 53-54.[114] Page 208 is Nurse Campbell's treatment note wherein she diagnoses Ashley with plantar fasciitis and suggests that he elevate

---

[109] R. 266. *See also* R. 305 ("Cardiomyopathty; Presumed Ischemic").

[110] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.00E.

[111] R. 272.

[112] *See Cowan,* 552 F.3d at 1187-88 (no need to further develop the record when sufficient information exists for the ALJ to make a disability determination and claimant's counsel does not request that additional records be obtained).

[113] Opening Brief at 25.

[114] *Id.*

his feet two times during the workday. Page 367 is Nurse Frost's check-box medical statement in which she states that Ashley may "occasionally" need to elevate his legs during an eight-hour workday. Ashley's own testimony about his need to elevate his legs is contained at the cited pages 35, 53-54. As to this testimony, the ALJ found that, after reviewing the entire record, Ashley's allegations that his needed to elevate his feet up to five hours a day was not entirely credible.[115] The evidence Ashley cites simply does not support a constant need to elevate his feet on a daily basis. Furthermore, because the record did contain some evidence that Ashley might have difficulty with his feet, the ALJ accounted for this in the RFC by limiting Ashley to a range of sedentary work, consisting of sitting most of the workday, with other limitations, including no stair climbing and no work requiring foot controls.[116]

---

[115] R. 17.

[116] R. 16-17.

**Order**

After a complete review of the record, the court finds that the ALJ's decision is supported by the record evidence as a whole, and the correct legal standards were applied in reaching the decision.

IT IS HEREBY ORDERED that the decision is AFFIRMED.

DATED this 28TH day of September, 2010.

BY THE COURT:

_____
DAVID NUFFER
United States Magistrate Judge